Thank you, Your Honor. Ben Coleman for the appellant. Mr. Marquez, I'd like to reserve two minutes for rebuttal. I'd like to begin with the voluntariness issue and then move to the pre-remit delay issue. With respect to the voluntariness issue, I believe the essence of the district court's holding and the thrust of the government's arguments on appeal is that the agents in this case did not expressly promise or threaten Mr. Marquez. They did not specifically state, if you confess, we're going to release your sick wife. If you don't confess, we're going to hold on to your sick wife. It's our position that that reasoning conflicts with Tangle. That Tangle makes clear that expressed promises or expressed threats are not what you looked at. You looked at what was implied or what would a suspect reasonably conclude from the agent's conduct. In this case, we have one agent who states that she is sure that they informed Mr. Marquez that his wife was ill. We have another agent who says, well, I don't remember anything about the wife being ill, but we did reference Mr. Marquez's wife to elicit information from him that when asked and you told him that it would be more likely to be released, she would be released if you confessed. She said, well, I don't know if I exactly used that word confess. Maybe if he told the truth. And at the very end, she admits that they informed him that he should consider his wife's welfare in telling the truth. I think that any reasonable person in that situation would conclude that if you confess, if you take the heat, your wife is going to be released. She's suffering in detention. We'll let her go. If you don't confess, things are going to be much more difficult for you and your wife. I think that's what would reasonably be concluded. And if you look at the comment in Tingle, that was the focus of the discussion in Tingle. The comment was simply, you might not see your child for a while if you go to prison. There was no express promise or threat. There was no express statement, if you do confess, we'll let you see your child, we'll be with your child. If you don't confess, we're going to take the child away. There was no express threat, no express promise. Instead, it was a sort of subtle form of psychological coercion, which I believe was the language in Tingle. He had, in fact, already arrested the wife. Is that right? That's correct. Did they tell him that? Well, they did tell him that his wife was sick and that they had previously interrogated her and interviewed her, and that he should consider his wife in the statements that he's saying. So they did tell him that they had already interviewed her, so I assume he knew that she was still in custody the entire time. They had stated that she was in a holding cell next to him, and that they weren't sure whether he knew or didn't know that she was sick, since they were in separate holding cells. But I believe it would have been clear to him, based on the comments made by the officers, that he knew that she was still in detention at that point in time. When the court of the district court said that Marquez would have known that she was sick, is there any reason that that would be true? I mean, there was like a five-hour period of time between when they were stopped and when she was interrogated. She could have gotten sick in the meanwhile. I mean, he knew she had diabetes, but he didn't know that she was actively sick. I read the district court's comments as meaning that he knew that she had diabetes, not that he necessarily knew that she was sick. Because I don't think there's any indication that he did know that she was sick until the agents told him so. There's certainly nothing in the record to indicate that they were communicating from cell to cell, from the separate holding cells, that she was telling him, you know, I'm really sick. It was only until the only evidence in the record is when the interrogating agents informed him that she was sick. So it's simply our opinion that, again, the focus of the inquiry is what would a suspect reasonably conclude, not that there has to be explicit promises or threats. And in this case, we have made a single claim. The final comments on the voluntariness that I'd like to just emphasize are that to the extent that the court thinks that, you know, the record maybe is not entirely clear, it's not 100 percent clear what exactly was said to Mr. Marquez, there are three things that I think are important. Number one is the prosecutor, the trial prosecutor, had the opportunity to conduct redirect examination of these agents and completely stayed away from this area in her redirect examination. She could have clarified anything and stayed away from it. The second thing, it is the government's burden in this case. They have the burden of establishing the voluntariness of the confession. So to the extent that the court is unclear, I think that, you know, emphasis should be construed against the government. And the third thing is that despite the fact that state law enforcement officers routinely either audio tape or videotape interrogations, the federal law enforcement officers continue to maintain this policy of refusing to audio tape or videotape interrogations, although the equipment is readily available and we're in the 21st century now, where if there were any doubts. Kennedy. There's no requirement that they do so. Marquez. There is no requirement, unfortunately, but to the extent that there were any doubts. Kennedy. There was a case in Idaho that said you had to do that, and the Supreme Court overruled it. Marquez. I don't believe the U.S. Supreme Court. I'm not aware of that case, but we're in the 21st century now, and there's no reason that they couldn't do it. So to the extent that there are any doubts as to what transpired during that interrogation, I think those doubts, based on the burden of proof and the other factors in this case, should be construed against the government. Kennedy. Well, this is quite a bit, factually, it's quite a bit short of Tingle, where there the specific threat was you won't see your child for a long time. Marquez. Well, I believe that, again, in that case, the record wasn't clear. The agent said, I might have said you might not see your child for a while. There was also some indication that perhaps it said you won't see your child for a while. The actual statement itself wasn't clear, but it was simply, you might not see your child for a while if you go to prison. That was it. I mean, there was no specific, explicit promise or threat. If you confess. Kennedy. So what do you think, here, the statement made that the what did the district court find that bring this in the ambit of Tingle, in your mind? Marquez. Well, the district court felt that it wasn't in the ambit of Tingle because there was no explicit promise or threat.  Well, I made some findings about what the district court thought had been said, because after listening to all the testimony, what statement that the district court found to have been made do you think brings this within Tingle? Marquez. Well, the district court's holding was this. There were some comments made about the wife. However, there was no explicit promises or threats that the wife would be released if he confessed or vice versa, that she would be held if he didn't confess. And therefore, I find that the comments about the wife did not render the statements involuntary. We obviously disagree with the district court's reasoning. We think that there doesn't have to be an explicit promise or threat. That instead, the inquiry is what would a suspect reasonably conclude based on the agent's conduct. And the agent's conduct speaks for itself. I mean, there's no conflicting testimony from we're not relying on Mr. Marquez's testimony. We're just simply relying on the agent's testimony. And that testimony speaks for itself. With respect to the pre-arraignment delay issue, it's our position that for the six-hour safe harbor period, when Congress in 3501 said that the relevant point is from arrest or other detention, that or other detention means something that occurred, like a border detention that occurred in this particular case, and that the government's reasoning, which essentially starts the clock from the time of arrest, renders those words or other detention mere subversion. But doesn't our case law say that even if there was a six-hour violation, there's still a reasonableness standard? And although I'm not sure I fully understand this, that how the magistrate would not be available, for example, in this instance, until 10 o'clock the next morning, that that would be reasonable at least until 10 o'clock the next morning. Now, I understand they didn't actually arraign him at 10 o'clock the next morning, but what difference does that make? They got the statement long before they would have been able to arraign him, right? Correct. So why isn't that the answer? Even if there was a six-hour violation, they got the statement within the time period before a reasonable period in which they would have been able to arraign him. Right. Well, I agree. I don't think that necessarily the law makes sense in this area. But the way I understand the law is this. First, you determine whether the six-hour safe harbor has expired. Then you just look at the reasonableness of the delay between the time of the arrest or other detention and the actual arraignment itself. Rule 5 says that the arraignment or the or whether the statement was obtained within the time that he could reasonably have been arraigned, which it was. I believe it's just the arraignment, because Rule 5, what we're doing is enforcing Rule 5. And Rule 5 says that a person that's arrested should be taken before magistrate without unnecessary delay. So in this case, you need to look to determine whether there was any unnecessary delay, which I believe there was, because he clearly could have been arraigned any time on Monday. But what we're looking at is the confession. We're not looking at the validity of the arraignments. Why would we worry about when he was actually arraigned as opposed to when he could have been arraigned? Because I believe it's a remedial. I mean, to enforce Rule 5, although perhaps the confession itself may not have been the result of the delay in the arraignment, but to enforce Rule 5 as a remedy for a Rule 5 violation, the remedy is a suppression of the statements. Or else, what would be the remedy to keep them from what if he didn't arraign them for a week, let's say? Let's say the delay was much longer. They didn't arraign them for a week, which clearly would obviously be a Rule 5 violation. And if he hadn't interrogated him at all, then he still may have not arraigned him for a week. So that making a suppression, suppressing a statement, which sort of fortuitously occurred within that time period, a remedy for the arraignment violation doesn't seem sensible. I agree it doesn't seem sensible, but I think that's the way the law is. It goes to was there an unreasonable delay? If there was and the statement was made outside the 6-hour safe harbor, then you suppress it. Even if, as in this case, he couldn't have been arraigned before the confession was made. That's just the way the remedy. That's the way the case law sets up. And the question in determining whether the delay is reasonable is simply the distance to be traveled to the magistrate, whether there were transportation problems, and whether a magistrate was available. Thank you, counsel. We'll give you a minute to reply. Good morning. May it please the Court. Hamilton Harrison for the United States. I'd like to address the issues in the order that Mr. Coleman addressed the issues beginning with the voluntariness issue and just make two brief points with respect to that question. I think the first thing that's particularly important is that in this case, the defendant is challenging the validity of his confession on the identical two grounds that he challenged that confession with the district court. The district court conducted three evidentiary hearings on this issue and concluded in the written findings that the confession was voluntary. Well, the conclusion that he knew she was sick seems clearly erroneous. If sick means that there was something actively wrong with her. There's no reason why he would have known that. He would have known she had diabetes, but why would he have known that she was actively ill? Well, I also, as Mr. Coleman read the district court's opinion, to mean that the defendant did have diabetes or, excuse me, his own. Why would that matter with regard to diabetes? Presumably, with regard to the problem with diabetes is you have an underlying condition, but it can become an act of dangerous situation at certain points. Well, it appears, and as Mr. Coleman indicated, the record is a little bit unclear, but it appears that she was exhibiting some symptoms of illness probably related to the diabetes. They weren't sure if the defendant was aware of this because he was in his own different state. The judge said he obviously was. Why was he obviously? Well, I think the judge indicated that because he had been riding with the defendant a few hours earlier in the car, that he would have been aware of those symptoms. But I don't believe that it was a key portion of the Court's ruling. What the Court said in the district court level, the defendant made the exact same arguments. And Mr. Lemon said, Your Honor, if we take the two statements of the agent together, we get a picture of what likely the defendant was told. I would submit that the reason he spoke to agents was he had a concern for his wife's welfare. In response, the district court says there were some statements made about his wife. His wife was ill at the time. They told him his wife was sick. But they didn't promise him that she would be released if he made any statement. So there was no coercion in that regard. Nor did they tell him that unless he exonerated his wife, she would be let go, or unless it was combined with a confession, she would be let go. None of that is said here. Well, that's clearly contrary to the record, because the second agent said, testified that maybe he did tell Marquez that the wife would be more likely released, quote, unquote, if he told the truth. And although the express word confession wasn't used, what else could that statement mean? Well, what happened here is there's a portion of maybe three or four questions and answers that I acknowledge there are some suggestive answers based on some leading questions that were asked by Mr. Lemon. And what the agent clarifies after that statement, she does say Mr. Lemon asked her, you know, did you say that Ms. Bellman would be released if he confessed? She says, no, well, maybe if he told the truth. And sensing that maybe he's getting the answer that he wants, Mr. Lemon attempts to clarify and says, so you told Mr. Marquez that his wife would be released if he told the truth. And the agent clarifies, no, that what she said was that he should consider his statement to police officers knowing that they had interviewed his wife and taken a statement from her. And that brings us to the next question. He should consider his wife's welfare in telling you the truth. I believe so. And what else could that mean? That's also subject to, well, that's also right after objection from the government and it is somewhat of a leading question. He says that he should consider his wife's welfare in making a statement to the officers. And what it, what my reading of the record is, is that she's saying that not in the context of consider his wife's welfare, whether she's sick or not, and whether she doesn't recall bringing up the wife's illness. What she's saying is consider his wife's welfare because she's provided a statement. And that brings this case in the, in line with the other cases where. But isn't the point that the second agent didn't recall bringing up the wife's, the first one, I don't remember which one, didn't recall that, isn't that kind of irrelevant? Clearly the agents were working in tandem. There's no, unfortunately, record of what the agents said to each other when they were outside and not interrogating Mr. Marquez. I'm quite, my, I mean, I would infer from this that they talked, that one of them knew they had told the other about the illness. Right. It does appear from the record that there was at least some mention of his wife's illness. But what's important about the fact that the second agent, Ginger Bracamonte, does not recall bringing, bringing that up herself is because she's talking about her conversations with the defendant about making, about thinking about the fact that they had talked to his wife already and that she had made a statement. That's really the key, because in this case, they are talking about the, they are apprising the defendant of all the facts, including the fact that they had talked to the passenger already and that she had provided a statement. This is not, this is the key. They didn't say that she provided a statement. They just said they talked to her. Yes. Yeah, that they, that they talked to the, yeah, exactly, that they talked to the passenger. They didn't say that she'd arrested her either. No, no, they didn't, although. I have a different question, which is somewhat to the side, but I was sort of surprised by it. And I think it has something to do with the issue here. The testimony was that his wife was sick. And the reason that we interviewed her first and told, we told him about her illness is because we don't have the liberty of setting the person of declining persecution. But because she was ill and we had first response to look at her, we wanted to make sure if they were going to decline persecution, prosecution, that we could get her medical attention. In other words, until they decline prosecution, they don't get medical attention. And obviously, the record is not extremely clear on this, but it's my. It's extremely clear, and that seems to be exactly what it says. Well, I apologize. I just mean with respect to the symptoms that she's exhibiting. I know that if defendants are brought or passengers or anyone who's arrested are brought to the border and they have serious medical symptoms, they're immediately taken to receive medical care. I think what the agent was talking about in this case is we're going to talk to both of these people. She does seem to be a little bit sick. When we get the statement straight, we take this to the prosecution's unit in the Border Patrol or in Customs. They decide who they're going to prosecute. If they're not going to prosecute the defendant, she is then taken to get medical care for whatever the symptoms are. And obviously, in this case, they weren't serious enough for her to be taken immediately. It sounds as if they're holding her, although ill, until they decline to decide to decline prosecution because of what he said. And I think that's one of the reasons that they took her statement first and then immediately go take the defendant's statement. But I think the key difference here between this case and Tingle are twofold. The first is that in this case, we have specific factual findings that the district court made. And the district court didn't just say there were no explicit promises. The district court says that they did not play on it. They did not say, look, if you exonerate your wife and confess, we will let her go and stop the prosecution of her. There were no promises made that would render the statement involuntary. And by saying that they did not play on it, the district court is making a finding that there were no implicit promises made either. And in Tingle, the court's specific --- You're deciding that although one of the – he's certainly agreeing that an illness was mentioned. He – that part of the statement. Yes. Yes. The court says that there were statements made about the wife. As to the other agent's testimony, he seems to be finding that although she said yes to whether he was – the wife would be more likely to be released if he confessed and then revised it slightly to say he should consider his wife's welfare in telling you the truth, I believe so, that those statements are not the equivalent of an – of an explicit or implicit crime. Well, exactly. And because when she's talking about his wife's welfare, she's talking about the fact that she had already made the statement and that the defendant needs to consider that, which is exactly the case that we had in Orso where the defendant is apprised of all the facts against him, and by doing so, the agents are allowing the defendant to make an exercise of his judgment about what course of action to take. Hasn't Orso been overruled by the Supreme Court? I don't believe on the voluntary indecision, Your Honor. But I think the key is that in this case, we have district court findings that explicitly say that there were no promises made to the defendant that would make that confession voluntary. And those findings are not clearly erroneous. And more importantly, in this case, which is different than in Tingle, the person that is allegedly being threatened is involved in the case. This is a passenger in the car. The officers have every right and obligation to question that – to question that witness or that defendant. And when they go in to talk to the defendant in this case, the driver, say, we've already talked to this person. We have a statement from this person. He didn't say we have a statement. Well, we – well, they said we've talked to this person. I mean, that – you know, it sort of implies that there was a discussion. And that you should consider that when you talk to us, because if you give a contradictory statement, that – you know, that could be bad for you. And so I think that when you – But that's not what they said. They said you could consider your wife's welfare, not your welfare. Well, you're right, exactly, in the fact that she had made a statement. And because she is a passenger in the car, and not merely, like in Tingle, a daughter who is being threatened, who has absolutely no relation to the case, that makes it significantly different. The similar was true in McShane, where the defendant was arrested at his girlfriend's house, and that's where the firearms are located. And so the court said that, yes, it's okay to bring her in for questioning, because she's involved. In Tingle, it's a totally innocent bystander, the daughter of the defendant. So I think that those two things make this case significantly different from the case from Tingle. And – Counsel, can I ask you a slightly different question? Of course. One of the agents talked about this passenger technique of interrogation. Yeah, I read that in the records. It's a little bit unclear from the questioning. But is that – has it ever been upheld? I – basically, what I – it sort of leads to what I was talking about, or goes back to what I was mentioning earlier, that when there are two passengers in the car, and both – there's marijuana or other contraband found in the vehicle, the agents talk to the passengers at different times, talk to the passenger and the driver at different times, and they get statements from both of the – from both of the people. And, you know, consistent with – with the law on, you know, questioning suspects, they can talk about the fact that they did already question another passenger in the vehicle because that passenger could potentially have made contradictory statements. And some courts have gone so far as to say that agents can even lie, even though it's reprehensible, to defendants about whether or not they received – they got evidence against that defendant. And that's actually the situation in Orso where agents sort of fabricated evidence or told the defendant that they had an eyewitness when they really – they didn't. And even in that situation, the court said, looking at the totality of the circumstances, that the statement was voluntary. And that's what we have here. The defendant is asking you to take, you know, three or four questions from three days of evidence you're hearing, and on the basis of that cold record, you know, find that the district court's determinations were clearly erroneous. And that's simply not the case. I – I guess the briefing – The briefing on the arraignment issue, the pre-arraignment delay, why – what I didn't understand is that, you know, the whole argument is, well, they couldn't take him to be arraigned because it was the middle of the night, and the magistrate didn't open up for business until 10 o'clock the next day. But they didn't take him there the next day. They waited until February 25 to take him there. That's correct. And I see that my time looks like it's expired, but let me answer Chris's question. Let me answer my question, and if anybody else has a question. Okay. The – the way the process works, and obviously they weren't questioned about it, the agents weren't questioned about it, so the record doesn't reflect this, but, you know, after someone is questioned, they take all the defendants that are from the port of entry in that – that evening or possibly the day before, depending on how many defendants there are, they take them to the Metropolitan Correctional Center. All the defendants need to be processed at the Metropolitan Correctional Center. Then at that point, the defendants who are on that day's calendar in the district – or in the magistrate court are taken over to magistrate court. But obviously, this process takes some time. So in this case, the defendant is finished – they're finishing their questioning. It appears around 6 a.m. in the morning. They, assumedly, take the defendant and everyone else that's been caught that evening. They release his wife then and then take – That's correct. So they did release the wife. That's correct. And so that's one of the reasons why they get the probable cause statement signed off – they did get the probable cause statement signed off on that day, on the 24th. But apparently, this defendant just didn't make it over in the run to the MC – and I do, you know, intake court all the time, so I know. But he just didn't make the run over for that day's magistrate court. And immediately the next day, he makes it over. If you go back to the statute, what is your explanation for the term, or other detention? By using the terms detention in the custody of law enforcement personnel, I believe that Congress was attempting to have this – have the statute start running in situations which were not only formal arrests, but situations akin to formal arrests, but where they hadn't said to the defendant, you're under arrest for this crime. So in this case, under Nava and Bravo and some of this Court's more recent opinions, the defendant is not in the custody of law enforcement personnel until they find that marijuana at 1210. But more importantly, I agree with some of the statements made by – made by Your Honor that – and also by Your Honor, that the reasonableness here is really key. The key question when we're evaluating whether a statement should be admitted after it's – in the six-hour window is whether the agents attempted to gain a better interview or some type of – some type of further interrogation, and because of that, delay the arraignment. In this case, that didn't happen. As the district court found, there was no place they could have taken him this morning. You know, they bring him in, they have four other cases, they process those four other cases, they talk to the passenger, they talk to the defendant, and then he gets processed over to MCC. He doesn't make it to arraignments until the next day, but it was not the reason for the delay. That was not the reason for the delay. It was the fact that they wanted to take a statement. So I submit it's within the six-hour period, and if it isn't, the delay was reasonable. And if the Court has any other questions, I'll submit them. Thank you. Thank you very much, Counselor Yarbrough. And Mr. Coleman, you can have another two minutes in rebuttal. Thank you, Your Honor. First, the counsel had mentioned a couple of times a clear error standard, a clear Lee-Roney standard for voluntariness. It's clear, overwhelmingly clear, that the standard of review is de novo for the voluntariness of the confession. We have here, we have the record, we have the aegis testimony right here, and this Court, based on that record, makes a de novo determination about whether the statements were voluntary or not. And that law is a little more of a question. What is your authority on that? Well, Tingle says de novo, and frankly, the government's brief also agreed that the voluntariness questions were viewed de novo. So I don't think that that's disputed. Voluntariness, the consent for search, is not de novo. Why is that? I agree, and I've argued that that doesn't make any sense, that the consent search is clear error, and voluntariness is de novo. But the law is overwhelmingly clear, I mean, voluntariness of the confession is de novo. It's the de novo standard, and the government concedes that. So this clear error reference is just wrong. Or so was mentioned a couple of times. Or so is simply a case where the defendant said, yeah, they threatened they were going to take away my children if I don't confess. And the agent said, no, we didn't do that. And the district court accepted the agent's version as credible, and this Court said that fact-finding on the credibility was not clearly erroneous. Kagan. He didn't say it, as opposed to the implication of what he did say. Right. And we have on the record here what was said. A follow-up with respect to the pre-alignment delay issue, for the first time, they didn't make this argument in their briefs. They've now, at oral argument, it wasn't done in the district court, it wasn't done in their briefs, they've now said that the reason for the delay, the extra delay to the following day, was because of some processing at the agency. It's not in the record. Right. It's not in the record, plus the fact that there's no reason why someone can't be brought to an arraignment and then brought to the MCC. You don't have to go to the MCC first before you're brought to an arraignment. So there was a delay here. And although I don't believe that the delay has to result in the confession, if he hadn't waited all the way until 5, 6 in the morning to interrogate Mr. Marquez, he probably would have been arraigned that same day. What do you think attention means? You think attention means any Terry stop? Yes. From the point of a Terry stop. From the point of a Terry type stop, through, assuming they're continuously kept in custody after that. Thank you, Your Honor. Thank you very much, counsel. U.S. v. Marquez will be submitted. Lloyd v. Hickman has previously been submitted on the briefs. Beardsley v. Mutual Service Casualty Company, insurance company.
judges: T.G. Nelson, Wardlaw, Berzon